**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANDREW FREE,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>DEPARTMENT OF JUSTICE,<br><br>950 Pennsylvania Ave.<br>Washington, D.C. 20530<br>　　　　　Defendant. | Case No. 26-CV-876<br><br>**FREEDOM OF INFORMATION ACT COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

**Preliminary Statement**

1.　This is a case about agency records of federal law enforcement personnel who engaged in alleged or substantiated criminal activity, civil and human rights abuses, or other serious professional misconduct.

2.　The federal government created a centralized repository of these individuals, called the National Law Enforcement Accountability Database ("NLEAD"), housed within the U.S. Department of Justice ("DOJ"), to ensure documented bad actors could no longer undermine public trust and game the system by leaving one federal law enforcement agency and joining another without notice or further vetting.

3.　Initial government analyses of this database reflected thousands of instances of criminal, civil, and policy misconduct by federal law enforcement personnel over a roughly six-year period.

1

4. Last year, a new administration abandoned the law enforcement accountability effort.

5. While the NLEAD database is no longer actively maintained, the records it collected were requested and required to be preserved under the Freedom of Information Act ("FOIA") and DOJ regulations implementing FOIA.

6. This case seeks to enforce the public's right to know what its government is up to by obtaining all reasonably segregable, non-exempt portions of NLEAD.

7. The central disputes before the Court in this action are: (a) whether DOJ complied with a preservation demand and its obligations under FOIA, the Federal Records Act, and DOJ FOIA regulations to preserve the records requested by the Plaintiff, or, alternatively, engaged in an improper withholding of records by unlawfully destroying them; and, if responsive records still exist, (b) whether the Department of Justice must release reasonably segregable portions of the records pursuant to the required balancing of public interests in learning of federal agents' alleged or sustained misconduct in Exemption 6 and 7C, most recently articulated in *Human Rights Defense Center v. U.S. Park Police*, 126 F.4th 711, 712 (D.C. Cir. 2025).

## JURISDICTION AND VENUE

8. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 552(a)(4)(B). Plaintiff's request for declaratory and

other relief is properly subject to this Court's subject-matter jurisdiction pursuant to 5 U.S.C. § 552(a)(4)(F) and 28 U.S.C. §§ 1331, 2201(a), and 2202.

9. Venue is proper within this district under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §§ 1391(b)(1), (b)(2), and (e)(1).

10. Plaintiff has exhausted all administrative remedies in connection with its FOIA requests, as detailed below.

11. Because Plaintiff brings this action after exhausting administrative remedies, this Court's jurisdiction is based on 5 U.S.C. § 552(a)(4)(B).

12. Congress passed the Freedom of Information Act, 5 U.S.C. § 552, in 1966 "to establish a general philosophy of full agency disclosure," S.Rep. No. 89–813, at 3 (1965), and "to assure the availability of Government information necessary to an informed electorate," H.R. Rep. No. 89–1497, at 12 (1966), 1966 U.S.C.C.A.N. 2418, 2429.

13. The statute provides that, subject to certain enumerated exemptions for classified documents, agency personnel and medical files, confidential financial information, and the like, (5 U.S.C. § 552(b)(1)-(9)), federal agencies generally must make their internal records available to the public upon request. Id. § 552(a)(3)(A).

14. As the Supreme Court has recognized, FOIA's disclosure regime shines a light on government operations "to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978).

//

## PARTIES

15. Plaintiff Free is a freelance investigative journalist, researcher, lawyer, and organizer who writes and publishes edited stories[1] and contributes his FOIA research to reports about deaths in ICE custody and the conditions that produce them.[2] Plaintiff also investigates and reports on law enforcement abuse and corruption issues.[3] He publishes a regular newsletter informing the public about deaths in DHS custody and the government's transparency practices[4] and is regularly cited or quoted in media outlets covering immigration detention issues.[5]

---

[1] *See generally*, Andrew Free, Muck Rack (last visited Nov. 4, 2025) available at https://muckrack.com/andrew-free.

[2] *See, e.g.*, ACLU, AM. OVERSIGHT, & PHYSICIANS FOR HUM. RTS., DEADLY FAILURES, PREVENTABLE DEATHS IN U.S. IMMIGRATION DETENTION 16 (2024) https://assets.aclu.org/live/uploads/2024/06/2024-07-01-ICE-Detainee-Deaths.pdf.

[3] *See, e.g.*, Andrew Free, *Trump's Deleted Police Misconduct Database Was Full of Prison and Border Incidents*, THE APPEAL (Feb. 27, 2025), https://theappeal.org/nlead-trumps-deleted-police-misconduct-database-full-of-prison-and-border/; Timothy Pratt & Andrew Free, *"Duped: How one Atlanta Cop Secretly Shilled For Police Tech*, THE INTERCEPT (Sept. 2, 2025), https://theintercept.com/2025/09/02/atlanta-seattle-police-axon-fusus-surveillance/; Andrew Free & Matt Scott, *Senior APD official failed to disclose financial interest in police tech company, ethics probe finds*, ACPC (June 26, 2025), https://atlpresscollective.com/2025/06/26/ethics-probe-freeman-fusus-conflict-of-interest/.

[4] *See* Andrew Free, Detention Kills (last updated Nov. 3, 2025) available at www.detentionkills.substack.com.

[5] *See, e.g.,* Lomi Kriel & Colleen Deguzman, *Six Deaths in six weeks: What to know about ICE detentions in Texas*, THE TEXAS TRIBUNE (Feb. 19, 2026), https://www.texastribune.org/2026/02/19/ice-detention-deaths-texas-east-montana-dilley-campos/; Brett Wilkins, *Private Prison firm GEO GROUP Reports Record $254 Million Profit After New ICE Contracts*, COMMON DREAMS (Feb. 12, 2026),

Federal FOIA agencies have repeatedly identified Plaintiff as a representative of the news media and filer of "significant FOIA requests" since at least 2022.[6]

16. Plaintiff's reporting, research, and scholarship rely on government records as an authoritative primary source for the official facts surrounding the in-custody deaths and law enforcement issues he writes about.

17. Defendant DOJ is a federal agency within the meaning of FOIA U.S.C. § 552(1)(f). The DOJ has possession, custody, and control of records responsive to Plaintiff's request.

//

---

https://www.commondreams.org/news/geo-group-ice-profits; Douglas MacMillian, *Medical examiner likely to classify death of ICE detainee as homicide, recorded call says*, WASH. POST (Jan. 15, 2026), https://www.washingtonpost.com/immigration/2026/01/15/ice-detention-death-homicide/; Isabel Del Mastro et. al, *ICE Inspections Plummeted as Detentions Soared in 2025*, POGO INVESTIGATES (Jan. 12, 2026), https://www.pogo.org/investigates/ice-inspections-plummeted-as-detentions-soared-in-2025; Rachel Uranga, *Immigrants decry conditions at former prison, ICE's largest detention center in California*, L.A. TIMES (Sept. 29, 2025), https://www.latimes.com/california/story/2025-09-29/detainees-protest-at-californias-largest-and-newest-immigration-detention-center; Emma Goldberg, *"People are Losing Hope" Inside ICE Detention Centers*, N.Y. TIMES (Sept. 16, 2025), https://www.nytimes.com/2025/09/16/health/ice-homeland-security-immigration-detention.html.

[6] *See, e.g.*, Weekly FOIA Report for Mar. 31, 2025, U.S. Department of Homeland Security at 8, 70, 130, and 164, available at https://www.dhs.gov/sites/default/files/2025-07/25_0731_PRIV_Chief_FOIA_Officers_Weekly_Report_March_31_25_to_June_30_25.pdf. (DHS began affirmatively publishing these Reports, which Free exposed the existence of through a prior FOIA request, pursuant to 5 U.S.C. 552(a)(2) following several prior releases to Free in response to his FOIA requests. See https://www.muckrock.com/foi/united-states-of-america-10/dhs-significant-foia-activity-190417/.

5

## FACTS

### A. NLEAD

18. On May 25, 2022, former President Biden issued Executive Order ("EO") 14074 titled *Advancing Effective, Accountable Policing and Criminal Justice Practices To Enhance Public Trust and Public Safety* (2022). *See* Exec. Order No. 14074, 87 Fed. Reg. 32945 (May 31, 2022). Section 5 of the EO directs the U.S. Attorney General to establish the National Law Enforcement Accountability Database ("NLEAD").

19. NLEAD launched on or about December 18, 2023, as "a centralized repository of official records documenting instances of law enforcement officer misconduct as well as commendations and awards." *See* BUREAU OF JUSTICE STATISTICS, NATIONAL LAW ENFORCEMENT ACCOUNTABILITY DATABASE, https://bjs.ojp.gov/national-law-enforcement-accountability-database (last visited Mar. 6, 2026).

20. One of the goals of EO 14074 was to "commit to new practices in law enforcement recruitment, hiring, promotion, and retention, as well as training, oversight, and accountability." 87 Fed. Reg. at 32946.

21. NLEAD was to include "all available information that the Attorney General deems necessary, appropriate, and consistent with law and considerations of victim confidentiality, concerning misconduct by Federal law enforcement officers relevant to carrying out their official duties[.]" *Id.* at 32949-50.

22. NLEAD was also to store accurate records of "official records documenting officer misconduct, including, as appropriate: records of criminal convictions; suspension of a law enforcement officer's enforcement authorities, such as de-certification; terminations; civil judgments, including amounts (if publicly available), related to official duties; and resignations or retirements while under investigation for serious misconduct or sustained complaints or records of disciplinary action based on findings of serious misconduct . . . ." *Id.* at 32950.

23. The EO also provided due process rights for officers to request amendment or removal of information about themselves from NLEAD "on the grounds that it is inaccurate or that it is predicated on an official proceeding that lacked appropriate due process protections." *Id.*

24. The EO required the heads of federal law enforcement agencies to submit the required information on a quarterly basis for inclusion in NLEAD and encouraged contributions from State, Tribal, local, and territorial Law Enforcement Agencies (LEAs) to contribute to and use NLEAD through procedures established by the U.S. Attorney General. *Id.*

25. To establish the database, NLEAD was instructed to gather Federal records from Department of Justice ("DOJ") databases, gather information held by other agencies through inter-agency agreements, acquire "publicly accessible and reliable sources of information, such as court records," and incorporate submissions by non-Federal LEAs. *Id.*

26. The EO directed federal law enforcement agencies to utilize the information stored within NLEAD in the hiring, job assignment, and promotion of federal law enforcement officers and required the Attorney General to establish procedures for similar employment-related inquiries from non-federal law enforcement agencies. *Id.*

27. The EO also provided for a high degree of public transparency for NLEAD including at least an annual public report containing anonymized data and to "assess the feasibility of what records from [NLEAD] may be accessible to the public and the manner in which any such records may be accessible by the public, taking into account the critical need for public trust, transparency, and accountability, as well as the duty to protect the safety, privacy, and due process rights of law enforcement officers. . . ." *Id.* at 32951.

28. The U.S. Attorney tasked the Justice Management Division ("JMD") with developing and maintaining NLEAD and tasked the Bureau of Justice Statistics ("BJS") with the responsibility of producing the annual report. *See* BUREAU OF JUST. STAT., NATIONAL LAW ENFORCEMENT ACCOUNTABILITY DATABASE, https://bjs.ojp.gov/national-law-enforcement-accountability-database (last visited Mar. 6, 2026).

29. On or about December 18, 2024, BJS published its first and only report covering NLEAD records for events occurring in calendar years 2018 to 2023, as well as usage of NLEAD from January 1, 2024, to August 31, 2024. *See* BUREAU OF

JUST. STAT., NATIONAL LAW ENFORCEMENT ACCOUNTABILITY DATABASE, 2018-2023 6 (2024), https://bjs.ojp.gov/document/nlead1823.pdf.

30. NLEAD encompassed over 148,000 federal law enforcement officers and agents. *Id.*

31. According to the unredacted portion of the FOIA results Plaintiff Free obtained, NLEAD recorded more than 5,200 instances of law enforcement officer misconduct from 2017-2024. Customs and Border Protection[7] and Bureau of Prisons officers made up more than 70% of those 5,200 plus misconduct instances. *See* Andrew Free, *Trump's Deleted Police Misconduct Database Was Full of Prison and Border Incidents*, THE APPEAL (Feb. 27, 2025), https://theappeal.org/nlead-trumps-deleted-police-misconduct-database-full-of-prison-and-border/.

32. In the BJS NLEAD report, the BJS noted that 63 percent (3,031) of incidents in NLEAD were for sustained complaints or records of disciplinary action "based on findings of serious misconduct." *See* BUREAU OF JUST. STAT., NATIONAL LAW ENFORCEMENT ACCOUNTABILITY DATABASE, 2018-2023 7 (2024) https://bjs.ojp.gov/document/nlead1823.pdf.

33. Nearly 10,000 searches were conducted on records in NLEAD in an eight-month period from January to August of 2024. *Id.* at 10.

---

[7] Customs and Border Protection independently tracks employee arrests. The number of arrests reported has steadily risen from 63,685 reported arrests in 2020 to 67,855 in 2025. *See* U.S. CUSTOMS & BORDER PROTECTION, REPORTED EMPLOYEE ARRESTS, https://www.cbp.gov/newsroom/stats/reported-employee-arrests (last visited Mar. 11, 2026).

9

34. Despite the more than 3,000 serious misconduct incidents recorded within NLEAD and the thousands of NLEAD database searches performed by law enforcement agencies, on January 20, 2025 (inauguration day), newly elected President Trump issued an EO summarily rescinding EO 14070 together with dozens of other EOs issued by the Biden administration. *See id.* at 3, 10; THE WHITE HOUSE, INITIAL RESCISSIONS OF HARMFUL EXECUTIVE ORDERS AND ACTIONS, https://www.whitehouse.gov/presidential-actions/2025/01/initial-rescissions-of-harmful-executive-orders-and-actions/ (last visited Mar. 13, 2026).

35. The DOJ subsequently decommissioned NLEAD and stopped publishing any additional reports. NLEAD is no longer active. *See* BUREAU OF JUSTICE STATISTICS, NATIONAL LAW ENFORCEMENT ACCOUNTABILITY DATABASE, https://bjs.ojp.gov/national-law-enforcement-accountability-database (last visited Mar. 6, 2026).

36. As reported in the Washington Post, the website for NLEAD disappeared and along with it "countless records of disciplinary actions, terminations, complaints, and settlements related to police misconduct." *See* Tom Jackman & Elizabeth Dwoskin, *Justice Department deletes database tracking federal police misconduct*, WASH. POST. (Feb. 21, 2025), https://www.washingtonpost.com/dc-md-va/2025/02/20/trump-justice-nlead-database-deleted/.

37. Trevor Hugh Davis, a data research scientist who tracks the disappearance of government websites, stated to the Washington Post that

10

"[o[fficers with serious misconduct histories often move between departments. Despite [NLEAD's] limitations, it addressed a real problem — rehiring officers who had been fired or resigned for misconduct . . . its removal sends a clear message about the new administration's priorities." *Id.*

38. During its short time in operation, NLEAD had "enable[ed] police personnel managers to dig deeper into someone's background," and helped address the "wandering officer phenomenon" by "helping] law enforcement agencies ensure they did not hire officers who have been criminally charged, fired for misconduct, or are otherwise unsuitable candidates" as "[p]roblem officers tend to move from agency to agency . . . ." *Id.*

B. **Plaintiff's FOIA Request**

39. On December 19, 2023, Plaintiff Free submitted a FOIA request to the Department of Justice's Office of Legal Policy seeking "[t]he contents of the National Law Enforcement Accountability Database." Plaintiff's request and correspondence are attached as Exhibit A.

40. The Department of Justice's Office of Information Policy ("OIP") responded to Mr. Free's request in a letter on January 10, 2024, acknowledged receipt of the request, and assigned the request case number FOIA-2024-00549. Noting that the records sought required the OIP to consult/search for the records with another office, the OIP categorized Mr. Free's request within the "unusual circumstances" category of 5 U.S.C. § 552(a)(6)(B)(i)-(iii) and stated that the agency had to extend the agency's response beyond the statute's permissible ten-day

11

extension. The OIP January 10, 2024, acknowledgment letter is attached as Exhibit B.

41. On January 22, 2024, the OIP sent Mr. Free a letter informing him that the office determined that the Justice Management Division was the likely department that held the records sought and had forwarded Mr. Free's request accordingly. The OIP January 22, 2024, determination letter is attached as Exhibit C.

42. The Justice Management Division ("JMD"), corresponded with Mr. Free the next day, acknowledging Mr. Free's request and assigning the request JMD FOIA tracking number 133352 and assigning the request complex track for processing. *See* Exhibit A.

43. Mr. Free checked in on his request three times over the next three months with no response from the JMD. *See id.*

44. The JMD finally responded to Mr. Free on June 14, 2024. The JMD apologized for the delay and notified Mr. Free that there was still no determination for his request. *See id.*

45. Mr. Free reached out to the JMD in July and August 2024 to inquire about the status of his request. On August 14, 2024, Mr. Free received a reply from Daniel Wagner from the JMD, who notified Mr. Free that he would be in contact once he had more information. Mr. Free replied the same day, informing JMD that it appeared the department had not yet made a determination on his request and that the agency's delay contravened 5 U.S.C. § 552(a)(6)(A)(i). *See id.*

46. On August 22, 2024, the JMD provided a response to Mr. Free's request. The JMD informed Mr. Free that "[t]he contents of the NLEAD database are not yet complete" because two federal agencies were still producing records and anticipated being able to produce responsive records to Mr. Free by mid-December 2024. The JMD also informed Mr. Free that it made a determination to withhold direct identifiers, such as names, dates of birth, and social security numbers, from the records under FOIA exemptions 6 and 7(C). The JMD August 22, 2024, response letter is attached as Exhibit D.

47. Mr. Free appealed the JMD's exemption 6 and 7(C) determinations the same day. *See* Exhibit A.

48. On September 13, 2024, the OIP acknowledged Mr. Free's appeal in a letter and assigned the appeal tracking number A-2024-02602. The OIP September 13, 2024, acknowledgement letter is attached as Exhibit E.

49. On November 15, 2024, the OIP notified Mr. Free by letter that it had determined Mr. Free's appeal of FOIA exemptions 6 and 7(C) to be premature since there had not yet been an adverse determination on the request as a whole. The OIP November 15, 2024, determination letter is attached as Exhibit F.

50. On December 16, 2024, Mr. Free followed up on his original FOIA request, which he had submitted nearly one year earlier. *See* Exhibit A.

51. The JMD gave Mr. Free a final determination of his request on December 18, 2024, by letter. The JMD granted Mr. Free's request in part but redacted a large portion of agency-identifying information under FOIA exemptions

6 and 7(C). The OIP December 18, 2024, final determination letter is attached as Exhibit G. Plaintiff's FOIA results are attached as Exhibit H (redactions appear p. 116-121).

52. In support of the withholding, the JMD stated that certain information could directly or indirectly identify individuals and, as such, that the privacy interests outweighed the public's interest in disclosure of the information. *See* Exhibit G.

53. Mr. Free appealed the JMD's withholdings the same day. *See id.*

54. On January 6, 2025, the JMD acknowledged Mr. Free's appeal and assigned the appeal tracking number A-2025-00621. *See* Exhibit A.

55. The JMD notified Mr. Free the next day that the department forwarded Mr. Free's appeal to the OIP for review. *See id.*

56. On February 11, 2025, the OIP informed Mr. Free that the office anticipated it would take a minimum of 6-8 weeks to complete his appeal. *See id.*

57. Approximately ten days later, Mr. Free sent the office a litigation preservation notice instructing the office to preserve and refrain from destroying any of the NLEAD database contents as they existed on that date. *See id.*

58. On June 19, 2025, Mr. Free followed up on his appeal and asked if the agency was close to a determination of his appeal. *See id.*

59. The OIP responded approximately three months later on September 16, 2025, affirming the JMD's prior determination to withhold information under

FOIA Exemptions 6 and 7(C). The OIP September 16, 2025, final determination of appeal letter is attached as Exhibit I.

60. According to the NLEAD data released thus far, DOJ's position is that dozens of federal officers who have been convicted in state courts, with their names appearing on public dockets, have a privacy interest outweighing the public's right to know. *See* Andrew Free, NLEAD FOIA DATA ANALYSIS, tab 1.[8]

61. According to the NLEAD data released thus far, DOJ's position is that hundreds of federal officers who have been found to have engaged in civil rights violations while working at taxpayer expense have a privacy interest outweighing the public's right to know. *See id.*

62. According to the NLEAD data released thus far, DOJ's position is that hundreds of federal officers who have resigned in lieu of termination for alleged violations of people's rights and policies in place to safeguard them have a privacy interest outweighing the public's right to know. *See id.*

63. DOJ's position is untenable in light of binding circuit precedent. *See Human Rights Defense Center v. U.S. Park Police*, 126 F.4th 711, 712 (D.C. Cir. 2025) (remanding the case to release non-exempt names of officers); *Prison Legal News v. Samuels*, 787 F.3d 1142, 1146 (D.C. Cir. 2015) (agreeing with appellant's argument that the Bureau of Prison's "categorical explanation" for its 6 and 7(C) FOIA exemptions was improper and remanding for further proceedings); *see also*

---

[8] Available at: https://docs.google.com/spreadsheets/d/e/2PACX-1vQtcfwLKKpS_sqtGUN-jY6IBhrnK1clo9-SnaMcJvzzA75bf38CNQbIQsCmWJ80kBiVi2zCWKXS3_a1/pubhtml#gid=0.

*Prison Legal News v. Lappin,* 603 F.Supp.2d 124, 128 (D. D.C. 2009) (finding that the Bureau of Prisons' search for responsive records was inadequate and ordering the Bureau to either conduct a new search or provide an affidavit to the court showing that the searches were "reasonably designed" to find responsive records).

## CLAIMS FOR RELIEF
### COUNT I
### VIOLATION OF 5 U.S.C. § 552(a)(3)

64. Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs as if fully set forth herein.

65. Defendant is wrongly withholding agency records by failing to produce non-exempt records responsive to Plaintiff's FOIA request, by failing to segregate and produce non-exempt records responsive to Plaintiff's FOIA request, and by failing to perform an adequate search for materials responsive to Plaintiff's FOIA request.

66. Defendants are obligated under 5 U.S.C. § 552(a)(3)(A) to promptly produce records responsive to the Plaintiff's FOIA request.

67. Plaintiff has a legal right to obtain such records, and no legal basis exists for Defendant's failure to disclose them.

68. Defendant's failure to disclose all responsive records violates their statutory obligations to make requested records promptly available to the public. 5 U.S.C. § 552(a).

//

//

## COUNT II
## VIOLATION OF 5 U.S.C. § 552(a)(4)(B)
## UNLAWFUL WITHHOLDING OF AGENCY RECORDS BY DOJ

69. Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs as if fully set forth herein.

70. DOJ is a government agency subject to FOIA and must therefore make reasonable efforts to search for and release requested records and otherwise lawfully support and provide the basis for any withholdings made pursuant to the exemptions provided by FOIA.

71. Plaintiff has a legal right under FOIA to the timely search and release of responsive, non-exempt agency records responsive to Plaintiff's FOIA Request.

72. DOJ improperly withheld records from Plaintiff by misapplying exemptions 6 and 7(c) to impose a blanket withholding of officer identities. This determination is erroneous. In order to justify withholdings under Exemption 6 of FOIA, the government must show "that a substantial invasion of privacy will occur if the documents are released" and must also "balance the individual's right of privacy against the public interest in disclosure." *Human Rights Def. Ctr. v. U.S. Park Police*, 126 F.4th 708, 713 (D.C. Cir. 2025). Conclusory privacy assertions that "lack even minimal substantiation of . . .[a] privacy interest or the potential harm from disclosing [officer] names" do not meet the threshold for an Exemption 6 withholding. *Human Rights Def. Ctr.*, 126 F.4th at 715.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

73. enjoin DOJ from continuing to improperly withhold records that do not qualify for protection under Exemptions 6 and 7(C);

74. enter judgment on all counts in favor of Plaintiff and against Defendant;

75. declare Defendant's withholdings under the FOIA unlawful and enjoin Defendant from continuing to withhold all non-exempt records responsive to the FOIA Request;

76. order Defendant to produce, within 20 days of the Court's order, or by such other date as the Court deems appropriate, all non-exempt records responsive to the FOIA Requests, all segregable records responsive to the FOIA Requests, and indices justifying the withholding of any responsive records withheld under any claim of exemption;

77. award Plaintiff reasonable costs and attorneys' fees pursuant to 5 U.S.C. § 552(a)(4)(E) and/or 28 U.S.C. § 2412(d)(1)(A); and

78. award Plaintiff such further relief as the Court deems just, equitable, and appropriate.

Dated: March 13, 2026

Respectfully submitted,

By: /s/ *Daniel Melo*
Daniel Melo
The Melo Law Firm
2920 Forestville Road
Ste 100, PMB 1192
Raleigh, NC 27616
(919) 348-9213
dan@themelolawfirm.com