**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

ANDREW FREE,

*Plaintiff,*

v.

DEPARTMENT OF JUSTICE,

*Defendant.*

Case No. 26-cv-876

**DECLARATION OF LAURENCE N. BREWER**

I, Laurence Brewer, declare the following to be true and correct:

1. I am the Director of the Office of Executive Records and Information Management (ERIM). I was appointed Director of the Office of Records Management Policy, the predecessor of ERIM, in July 2024. In my role as the Director of ERIM, I coordinate and oversee the Department's directives management program, the Justice Management Division (JMD) Freedom of Information Act (FOIA) program, the records and information team supporting the Department and its components, and the Department's Executive Secretariat program. I also serve as the liaison to the National Archives and Records Administration (NARA) for reporting and compliance with government-wide recordkeeping requirements. Prior to joining the Department of Justice, I held the position of Chief Records Officer for the U.S. Government at NARA. I earned my Certified Records Manager (CRM) designation in 1998.

2. Due to the nature of my official duties as Director of ERIM, I am familiar with JMD's obligations under the FOIA, including the requirement to make records promptly available to a requester.

3. The statements and conclusions contained in this declaration are based upon information available to me in the performance of my official duties, as well as my review of the records in question and materials relating to the National Law Enforcement Accountability Database ("NLEAD").

## I. Background

4. The NLEAD was established in December of 2023 in accordance with Section 5 of Executive Order 14074, *Advancing Effective, Accountable Policing and Criminal Justice Practices To Enhance Public Trust and Public Safety* (May 25, 2022). The Order directed the Attorney General to establish the NLEAD as a "centralized repository of official records documenting instances of law enforcement officer misconduct as well as commendations and awards."

5. The Order directed that the NLEAD was to include the following types of records:

- Category 1: Criminal convictions
- Category 2: Suspension of a law enforcement officer's enforcement authority
- Category 3: Terminations
- Category 4: Civil judgments related to official duties
- Category 5: Resignations or retirements while under investigation for serious misconduct
- Category 6: Sustained complaints or records of disciplinary action based on findings of serious misconduct
- Category 7: Officer commendations and awards

6. The NLEAD did not hold the actual records of law enforcement officer misconduct. Instead, the NLEAD served as a "pointer system," in which an entry in the NLEAD indicated that another federal agency holds a record. Federal agencies were directed to check the NLEAD in the course of hiring, job assignment, and promotion, and if the NLEAD indicated that a record existed, to obtain that record from the relevant agency before taking any action.

7. An entry in the NLEAD consisted of the following information:

| Data field | Type/format | Optional? | Example | Notes |
|---|---|---|---|---|
| department_acronym | text | Mandatory | "DOJ" "DHS" | Standard, unique value |
| agency_acronym | text | Mandatory | "FBI" "CBP" | Standard, unique value |
| division | text | Optional | "Office of Field Operations" | Office/division if available |
| employee_unique_id | text | Optional | 1234567-A | Agency's unique employee identifier |
| last_name | text | Mandatory | "Doe" | |
| middle_name | text | Optional | "Allen" | |
| first_name | text | Mandatory | "John" | |
| name_suffix | text | Optional | "III" "Jr" "Sr" | |
| ssn | number: XXXXXXXXX | Mandatory | 023456781 | No dashes |
| dob | date: MMDDYYYY | Mandatory | 10101980 | Date of Birth must be between 18 and 100 years of age at time of submission |
| job_series | number: XXXX | Mandatory | 1811, 0006, 0025, 0083, etc. | Departments should identify law enforcement officer positions using the following definition: "an officer who is authorized to make arrests and carry firearms and is employed by a governmental unit or subunit that is responsible for the prevention, detection, and investigation of crime or the apprehension of alleged offenders". |
| flag_type | number: 1 through 7 | Mandatory | 4 | Provide only a single digit between 1-7. Please provide one row per misconduct event or award. One LEO may |

| Data field | Type/format | Optional? | Example | Notes |
|---|---|---|---|---|
| | | | | have multiple rows of data. |
| flag_type_detail | text | Optional | Department / Agency level Award | See below for guidance on each type |
| judgment_amount | number | Optional | 5000 | Include amount of civil judgment if publicly available. This should be a positive number, decimal or integer meant to indicate US dollar amounts. Please do not include currency signs. |
| event_date | date: MMDDYYYY | Mandatory | 12/12/2022 | Date of misconduct incident occurred or date of commendation. Must be between submission date and 7 years prior |

8. JMD was given primary responsibility for developing and maintaining the NLEAD.

9. Ninety-four federal agencies reported the existence of records of law enforcement officer misconduct (or the absence thereof) to the NLEAD.

10. By September 20, 2024, all federal agencies required to report to the NLEAD (and four additional agencies that voluntarily participated) had reported the existence of records or documented that they had zero reportable records.

11. For the period from 2018 through 2023, NLEAD reporting agencies encompassed 148,280 officers, and the NLEAD indicated the existence of 4,790 incidents of officer misconduct by 4,011 federal law enforcement officers.

12. From January 1, 2024, through August 31, 2024, 9,985 searches were conducted on the NLEAD. Of those searches, 25 resulted in a cross-agency match, meaning that the NLEAD reported that another agency held responsive records.

13. The NLEAD was decommissioned in 2025.

## II. The FOIA Request and Processing

14. On December 19, 2023, Plaintiff submitted a FOIA request to the Department's Office of Information Policy ("OIP") seeking the contents of the National Law Enforcement Accountability Database (the "FOIA Request").

15. On or about February 22, 2024, OIP forwarded Plaintiff's request to JMD for processing.

### A. Search and Data Extraction

16. Following receipt of Plaintiff's FOIA request, JMD personnel coordinated with technical administrators within JMD OCIO maintaining the NLEAD database server. Technical personnel performed an electronic extraction and query of the master NLEAD data tables containing all active agency-reported entries as of November 5, 2024. This extraction encompassed 100% of the active database records held in the NLEAD. No other database or record system within JMD holds the centralized NLEAD pointer data responsive to Plaintiff's request.

### B. Categorical Redaction Framework (Exemptions 6 and 7(c))

17. As a threshold matter, JMD determined that individual NLEAD entries lacked sufficient information to allow a full appraisal of the individual privacy interest and public interest implicated in the disclosure of a record. Because JMD lacked sufficient information about each entry to make that determination, and because seeking individual information on each of the thousands of entries would be unworkable, JMD determined that it was necessary

to withhold information in certain categories rather than proceed record-by-record. JMD determined that a FOIA requester who sought information about law enforcement officer discipline could request it from the law enforcement agency, and that agency would be in a position to balance the law enforcement officer's privacy interests against the public's interest in understanding how law enforcement officer discipline was handled.

18. JMD then determined that the privacy interests of the individuals whose data was held in the NLEAD were substantial, not *de minimis*, because individuals have a substantial privacy interest in personnel disciplinary records.

19. JMD determined that NLEAD entries were files similar to "personnel and medical files . . . the disclosure of which would constitute an unwarranted invasion of privacy" within the meaning of Exemption 6 because they contained information personal to the law enforcement officers identified in the entries.

20. JMD then determined that the NLEAD was compiled for a law enforcement purpose within the meaning of Exemption 7(C), namely, to ensure that federal agencies hire qualified law enforcement officers and that hiring agencies are informed about the existence of misconduct records prior to hiring or promotion.

21. JMD next evaluated the public interest in NLEAD entries. JMD determined that because NLEAD entries are pointers to records of law enforcement officer misconduct, but were not themselves substantive records with any detail as to that misconduct, there was minimal public interest in NLEAD entries. JMD evaluated the public interest in light of the FOIA's basic purpose, allowing public

scrutiny of agency actions. The NLEAD entries contain almost no information about the underlying incidents at issue, rendering the public unable to assess the misconduct of the law enforcement officers at issue or the agency's response to that misconduct. JMD thus determined that disclosure of NLEAD entries without the underlying records supporting the entries would not serve a significant public interest because it would not facilitate the public's scrutiny of agency action. (JMD also noted that the disclosure of NLEAD entries would shed no light on the activities of JMD itself.)

**C. Application to Specific Data Fields**

22. With these factors in mind, JMD considered each category of information. First, JMD considered identifying information – name, date of birth, social security number information, and employee identifying number. JMD determined that identifying information was properly withheld under Exemptions 6 and 7(C) because information identifying an individual as a federal law enforcement official can lead to reasonably foreseeable invasions of personal privacy given the inherent sensitivity of these positions. JMD also noted that some law enforcement officials would have retired or otherwise departed from federal service, decreasing the public interest in their records.

23. JMD considered whether it would be appropriate to release identity information about individuals who were convicted of crimes, given that records of those convictions were likely public. However, JMD determined that this information remained exempt from disclosure under Exemptions 6 and 7(C). JMD

first noted that in many cases, the fact of criminal conviction might be practically obscure, such that the privacy interests at issue may not be substantially diminished. JMD noted that the convictions in the data set were in some cases years old and may have been forgotten in part or in whole, strengthening the privacy interest at stake.

24. JMD further noted that it was possible that disclosure of identifying information for those convicted of crimes could in some cases compromise law enforcement operations. Disclosure of identifying information from the NLEAD for an individual discloses that that individual was or is a law enforcement official. While the fact of a criminal conviction may be public, the fact that the individual was a law enforcement official may not be. Accordingly, disclosure of identifying information from the NLEAD could have the effect of compromising undercover law enforcement operations. Because JMD does not maintain the records underlying the NLEAD entries, JMD had no indication as to whether any individuals in the NLEAD were or were not in such a situation; such a determination would need to be made by the law enforcement agency that maintains the underlying records.

25. JMD further determined that it is reasonably foreseeable that public disclosure of the fact that an individual committed misconduct could lead to severe personal and professional harm. JMD considered the potential harm to law enforcement officers of being publicly identified as subject to discipline, without any context as to the nature of the offense or the consequences of that offense. JMD evaluated this potential harm in light of the ready availability of personal

information in public records, such as address and family information. Accordingly, JMD determined that it was reasonably foreseeable that if law enforcement officers were publicly identified as being listed in the NLEAD, those officers and their families could face significant negative consequences.

26. Weighing the privacy interests against the public interest in disclosure, JMD determined that disclosure of identifying information would constitute an unwarranted invasion of personal privacy. Accordingly, JMD determined that the primary identification data in the NLEAD entries (name, date of birth, last four digits of social security number, hash of social security number and date of birth, employee unique identification number) were properly withheld under Exemptions 6 and 7(C).

27. JMD next considered whether information that could lead to the identification of individuals should be redacted. JMD determined that for the same reasons that identifying information was exempt from disclosure under FOIA, information that could reasonably lead to the identification of an individual was similarly exempt. Accordingly, JMD determined that the day and month of incident and flag type detail were properly withheld under Exemptions 6 and 7(C), as these could be tied to public reporting of incidents and thus lead to identification of law enforcement personnel.

28. Similarly, because many agencies reporting information to the NLEAD have very few law enforcement officials, JMD determined that disclosing the agency or subagency where there are fewer than 50 NLEAD entries could reasonably lead

to the identification of law enforcement officers in the NLEAD. Accordingly, JMD withheld the agency or subagency where there were fewer than 50 entries in the NLEAD for that agency or subagency. For the same reason, JMD determined that the job series and subdivision were properly withheld under Exemptions 6 and 7(C).

29. Finally, JMD determined that there was minimal public interest in the identification of the users that updated NLEAD records, and a significant personal privacy interest weighing against disclosure of the identities of those users. JMD determined that it was reasonably foreseeable that administrative personnel could suffer harms if their identities and involvement with law enforcement officer disciplinary records became publicly known. Accordingly, JMD determined that the identities of the users who updated NLEAD records were exempt from disclosure under Exemptions 6 and 7(C).

30. JMD also analyzed whether entries of commendations and awards were exempt from the FOIA. JMD determined that the personal privacy interest in the confidentiality of those entries remained significant, both because public release in a database overwhelmingly composed of misconduct entries creates a high risk of misinterpretation or unwarranted public stigmatization, and because an award or commendation entry in the NLEAD indicates a corresponding disciplinary entry. JMD further determined that for the reasons stated above, the public interest in law enforcement officer award and commendation entries was minimal. Accordingly, JMD determined that entries of commendations and awards should be treated in the same manner as entries reflecting disciplinary records.

## III. Foreseeable Harm

31. Pursuant to 5 U.S.C. § 552(a)(8)(A), JMD specifically evaluated the foreseeable harm that would result from disclosing individual identifying data fields and secondary identifying attributes.

32. In light of modern open-source intelligence, reverse-search technology, and public record aggregators, releasing names, employee IDs, precise event dates, or small-agency identifiers creates a reasonably foreseeable risk of harassment, targeted doxxing, identity theft, and physical or professional retaliation against current and former law enforcement officers and their families.

33. Moreover, publicly branding an officer in a federal misconduct registry without providing the full, contextual administrative record creates a severe, irreversible risk of unwarranted stigmatization. JMD determined that these harms are concrete, real-world, and reasonably foreseeable upon release of the redacted fields.

34. On December 18, 2024, JMD responded to Plaintiff's FOIA request. JMD provided Plaintiff with the contents of the NLEAD, with the exempt data redacted.

## IV. Segregability

35. JMD conducted a careful, field-by-field review of the NLEAD dataset to ensure that all non-exempt, reasonably segregable information was released to Plaintiff.

36. JMD determined that all non-identifying, aggregate data fields—including general field categories, non-sensitive statistical codes, and unredacted macro-level entry counts—could be segregated and released. The withheld fields (such as names, SSN hashes, specific sub-agency listings with fewer than 50 entries, and precise event dates) are so inextricably intertwined with personal privacy interests that no further meaningful, non-exempt information could be segregated and disclosed without revealing the very identities and protected privacy details Exemption 6 and 7(C) are designed to safeguard.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 15th day of October, 2026.

LAURENCE BREWER

Digitally signed by LAURENCE BREWER
Date: 2026.10.15 15:12:00 -04'00'

Laurence N. Brewer